Filed 6/21/16  In re S.F. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re S.F. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHERYL H.,<br><br>    Defendant and Appellant. | G052753<br><br>(Super. Ct. Nos. DP026019, DP026020)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary G. Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part, reversed in part, and remanded.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*        \*        \*

Cheryl H. (mother) appeals from the juvenile court's jurisdictional and dispositional findings concerning her daughters S.F. (born March 2005) and M.F (born October 2006). (Welf. & Inst. Code, § 300, subd. (b); all statutory citations are to this code unless otherwise noted.) Mother contends the juvenile court violated her due process rights by amending the juvenile dependency petition to conform to proof after trial, the jurisdictional findings were not supported by substantial evidence, and the juvenile court erred concerning application of the Indian Child Welfare Act (ICWA). For the reasons expressed below, we affirm, and remand with instructions.

I

FACTUAL AND PROCEDURAL BACKGROUND

In March 2015, the Orange County Social Services Agency (SSA) filed a noncustody juvenile dependency petition alleging there was a substantial risk S.F. and M.F. would suffer serious harm or illness because of the failure or inability of their parents[1] to supervise or protect them adequately. The petition also alleged the children were at risk of harm because the parents willfully or negligently failed to provide adequate food, clothing, shelter or medical treatment, and were unable to provide regular care due to the parents' mental illness, developmental disability or substance abuse.

Specifically, SSA alleged mother had a longstanding history of neglecting her children. Social service agencies had conducted over 20 prior investigations for child abuse or neglect spanning the period 1997 to 2014. Mother received services from the domestic abuse unit from 2001 through 2002. She received voluntary family services from July 2001 through March 2002, and refused voluntary services on other occasions. In January 2015, she signed a safety plan agreeing to enroll S.F. and M.F. in school and schedule medical and dental appointments. She failed to follow through on referrals and

---

[1] In the petition and its reports, SSA identified Louis F. as the girls' alleged father. Mother reported Louis was deceased. Paternal relatives surfaced a few months later and verified Louis died in 2009 by producing a death certificate.

2

missed all Team Decision Meetings (TDM) scheduled to assist her in complying with the plan.

The petition alleged on March 16, 2015, the family's residence contained health and safety hazards, including dead rodents, no electricity, dangling electric cords, and bathroom cabinets smeared with feces. Toilets did not function and the home smelled of urine. Significantly, mother never enrolled the children in school and had not completed paperwork or received authorization to home school the children. Mother had not taken the children to the doctor or dentist in over two years. SSA suspected mother might have unresolved mental health and substance abuse issues.

The detention report reflected the children remained in mother's care. Mother denied any Indian heritage and stated father was deceased. The social worker observed the Indian Child Welfare Act did not apply.

The report described prior investigations of the family dating back to 1997. The investigations involved sexual abuse against an older sibling, Erika M., by her father, and emotional abuse against Erika by the maternal grandmother and mother. Other investigations involved domestic violence between mother and her partners, drug abuse by mother, posttraumatic stress and suicidal and homicidal ideations by Erika, severe mental health issues involving a half brother, K.H., and mother's failure to provide K.H. with prescribed medication and psychiatric treatment, and failing to ensure K.H. attended school. Mother failed to protect K.H. from Erika, who drove without a license, acted aggressively and expressed suicidal ideations. In July 2010, mother had been arrested for possession of methamphetamine and a drug pipe. She admitted to a bipolar diagnosis and requested family counseling services. There was an allegation in late 2011 that mother physically abused the maternal grandmother in the children's presence. Mother reported she had home schooled her daughters since 2013.

In early January 2015, a social worker investigated a report of unsanitary conditions in the mother's home. After an investigation, the social worker concluded the

3

home was generally clean with adequate food in the refrigerator, and the children appeared healthy and safe. Mother, however, reported she feared Erika, who she claimed had posttraumatic stress disorder and used crack cocaine. Mother claimed she and the children suffered memory loss caused when Erika deliberately "made a hole" in a gas pipe.

Mother admitted hospitalization for a psychiatric condition at age 15 or 16. She did not graduate from high school and did not work, but she received disability payments for her bipolar disorder and a back injury, and she cared for the maternal grandmother, who suffered from dementia. Mother tried marijuana at age 13, but denied using other illicit drugs or alcohol.

The children had Medi-Cal, and were up to date on immunizations, but mother could not name the girls' pediatrician. She claimed their last physical exam was in 2012, and the last dental exam was in March 2013. Mother agreed to schedule medical and dental exams.

The girls had never attended school. Mother claimed to be home schooling the girls because she feared Erika would show up at school and harm them. She admitted receiving no training and did not have permission from a school district to keep her children out of school.

Mother declined voluntary services, but signed a safety plan. She agreed to schedule medical and dental visits and to enroll the girls in school by late February 2015.

The social worker conducted an unannounced follow-up visit on February 9, but mother would not let him in the house. The worker, however, spoke to the children outside. He could not determine whether they had learned anything from home schooling, and it appeared M.F. suffered developmental delays. There was no indication the girls had received any formal education. Mother claimed she could not enroll the children in school or schedule medical visits because she did not have birth certificates and immunization records, which she claimed Erika had stolen. The social worker

4

advised mother how to obtain the documents and asked her to call him after receiving them. Mother phoned the next day, crying, stating she could not obtain birth certificates without identification, which Erika also had stolen. The social worker advised mother and K.H. how she might solve the problem. The social worker attempted to make an unannounced compliance visit on February 24, but no one answered, although it appeared people were home.

On February 25, 26, 27 and March 3, the social worker left voicemails reminding mother of the TDM she had agreed to attend on March 4, and asked if she would be attending. Despite several reminder calls and messages, mother failed to attend the TDM. Adult protective services, code enforcement, the public health department and school district officials tried unsuccessfully to make a home visit.

Mother left a voicemail with the social worker stating she had completed the safety plan and would be faxing the social worker information about school enrollment, and medical and dental information. On February 24, mother faxed documents that did not support her claim she had enrolled the children in school or scheduled medical and dental appointments.

The social worker made another unannounced home visit. Mother would not let the social worker into the home. She claimed she did not attend the TDM because of car trouble and that she left the social worker a message. Mother also claimed she had enrolled the children in school and scheduled medical and dental appointments, but could not provide any proof. She agreed to attend a TDM on March 10. The social worker said he would arrange transportation.

On March 9, the social worker left a message for mother stating he arranged a taxi for her and the children for the TDM. Mother returned the call after business hours, stating she would not attend the meeting because she was taking her car in for repair. The social worker left a message for mother stating he was filing a noncustody court case, and mother would have to bring the children to court on March

5

23.  The next day, mother phoned she was waiting for the taxi.  She also sent a long e-mail to the social worker complaining he was doing nothing to help her or the children.  She claimed he had not done anything to protect her from Erika, who had apparently vandalized her car.

On March 16, the social worker, accompanied by Santa Ana police officers, served a warrant to investigate and assess the safety of the family's home.  Mother resisted entry for over 45 minutes, but submitted to a search after a police sergeant arrived.  The social worker noted unsanitary and unsafe conditions in the home and garage, which he recounted in the juvenile dependency petition.

After mother missed another TDM, the social worker, in consultation with a supervisor, nevertheless concluded the children were not at imminent risk in the home despite the unsafe and unsanitary conditions.  The social worker recommended the children remain in mother's care with protective orders.  These included ordering mother to enroll the children in school and sign a release authorizing SSA to obtain information about the children from schools, health care providers, and others; ordering mother to ensure the children received medical and dental checkups; ordering an evaluation of M.F. to determine whether she suffered from developmental or cognitive delays; ordering mother to maintain a clean home free of hazards with functioning utilities; and require mother to test clean for illegal drugs for at least one month, and participate in a mental health evaluation to assess her current level of functioning.

Mother failed to appear at the initial hearing on the petition on March 23, 2015.  The court issued bench warrants for mother and the children.

Social workers served the warrants with police officers on May 19.  The officers forcibly entered after no one responded to 30 minutes of knocking and verbal warnings.  They found mother hiding in a closet with a wooden bat, and the children, crying and frightened, hiding in a closet in a different room.  One of the girls pointed scissors at the officers.  The home was extremely cluttered with trash, clothing, and other

6

items.  The home was dark and the windows were covered with cloths.  The children appeared to have been sharing a small children's bed in the living room.  Neither girl could spell her own name or provide a date of birth.  The girls stated they knew police officers were outside their home.  The social worker previously had noted the presence of security cameras outside the home.

SSA filed an amended petition and detention report.  The court detained the children and scheduled a jurisdictional hearing for June 30.  The children were placed in a foster home.  The court authorized funds for drug testing and ordered SSA to refer M.F. for a psychological assessment and treatment.  The court ordered a neutral monitor for visits.

SSA's report for the jurisdictional hearing reflected mother did not make herself available to discuss the allegations of the petition.  She claimed the court had not ordered drug testing and stated she would not participate in a drug patch program.

The caregiver took the girls to a physician for physical exams, where they received several vaccinations.  Both girls were diagnosed with vision and learning problems and referred to the Child Youth Services for evaluation.

The caregiver reported S.F., now attending fourth grade, functioned at a kindergarten or first grade level.  M.F., enrolled in third grade, functioned at a preschool to kindergarten level.  M.F. could not identify letters, sounds, or numbers, she could not write her name, and did not know her birthday.  She could not put her shoes on correctly.  Both girls acted defiantly, and talked about killing.  M.F. issued threats about the caregiver's dog, warning "she would hang her, beat her with a hammer or cut her with a knife."  She also picked the dog up and threw it down on the granite floor at least twice.  S.F. lied, interrupted, did not listen, and called M.F. crazy.  S.F.'s teacher reported S.F. threatened other children at school.

Erika, now 30 years old, told the social worker she and mother did not have an amicable relationship.  She claimed mother and K.H. "jumped her in a parking lot"

around June 2014 because mother did not want Erika visiting the maternal grandmother. According to Erika, mother had bipolar disorder and used methamphetamine. K.H. also had mental problems and did not take his medication. The children had never attended school and had been "affected by [] mother's craziness." Mother feared the girls would be kidnapped by paternal relatives in Louisiana, which Erika claimed was an unfounded concern.

M.F. stated mother told them the police were going to take them away. She held a pair of scissors to "'chop off the heads of the police'" because "'that's what [her] momma said to do.'"

A paternal aunt contacted the social worker, and advised she lived with the paternal grandmother in Louisiana. She and the paternal grandmother expressed interest in caring for the children if mother could not. They had attempted to contact the children over the years, but mother prevented it.

Mother would not meet with the social worker, missed drugs tests, and arrived late or not at all for visits. When they did speak on the phone, mother minimized issues and became defensive when asked why she could not attend her scheduled visits.

The children required extensive dental work. The assistant principal at the girls' school reported they were academically limited, and required specialized educational services. The girls showed signs of emotional disturbance in the caretaker's home and at school. M.F. continued to threaten to kill S.F. She had trouble sleeping and wandered the house at night.

Mother continued to miss appointments and did not submit to drug testing. She had not investigated mental health treatment because she did not like how she was treated the last time she spoke with a therapist. The social worker learned the maternal grandmother had obtained a three-year protective and move-out order based on elder abuse against mother in October 2011.

At the July 23 jurisdictional hearing, the social worker testified SSA decided to take the children into protective custody because mother declined voluntary services and failed to comply with the safety plan. The social worker agreed there was no evidence mother's home currently contained health and safety hazards, and the court granted SSA's motion to dismiss this allegation. Mother presented no affirmative evidence.

The court allowed SSA to amend the petition to conform to proof, over mother's due process objections. The court sustained the petition, finding mother suffered from mental illness, delusions, and paranoia that placed the children at risk of serious physical harm. The court found the incident where mother directed the child to wield a weapon in the presence of police officers to be "incredibly dangerous" and it "could have resulted in the serious injury or even death of these children."

The court scheduled a disposition hearing and ordered a psychological evaluation to consider several issues, including whether mother suffered from a mental disability. A psychologist appointed to evaluate mother concluded mother suffered from a delusional disorder substantially interfering with her parenting and the girls were at risk of suffering the same neglect and stunted development exhibited by their older half-brother K.H. The psychologist noted "[l]osing their early childhood educational years is devastating to these two minors, because grades K-3 are the most crucial; and their socialization is apparently very poor. . . . The mother does not view herself as having failed in her parenting or having done anything wrong. . . . Mother's chronic mental illness is ego-syntonic, e.g. she does not experience herself as having a problem so she feels she is protecting her children, but the reality is that the children are victimized by her delusional fears in which needed care has been neglected. [¶] There is a risk of inducing a shared delusional disorder with the children if this has not already occurred."

Mother's counsel submitted on SSA's reports and stipulated to dispositional issues. Based on the stipulation, the court declared the children to be

9

dependents of the juvenile court (§ 360, subd. (d)), removed the children from mother's custody (§ 361, subds. (c)(1)), and found ICWA did not apply. The court approved SSA's reunification case plan.

## II

### DISCUSSION

A. *The Juvenile Court Did Not Err by Allowing Amendments to Conform to Proof*

Mother contends the juvenile court erred by granting SSA's motion to amend count b-11 and add count b-13 to the petition to conform to the evidence admitted at trial, and sustaining the amended petition without allowing her to cross-examine the social worker or to testify on her own behalf. We do not find the contentions persuasive.

The first amended petition contained multiple factual allegations under section 300, subdivision (b), in support of SSA's position the children had suffered, or there was a substantial risk they would suffer, serious physical harm or illness because mother failed to supervise or protect the children adequately, failed to provide adequate food, clothing, shelter or medical treatment, and was unable to provide regular care due to her mental illness or substance abuse.

The allegations included mother's longstanding neglectful behavior toward the children and their half siblings, her failure to comply with the terms of the safety plan she agreed to, the health and safety hazards in the home on March 16, 2015, mother's failure to enroll the children in school, her failure to take the children to a doctor or dentist for at least two years, and her failure to protect the girls from Erika, who mother believed intentionally caused a gas leak that resulted in the children suffering adverse health issues. The petition cited mother's apparently unresolved mental health issues as a factor in the case.

Two allegations specifically related to the events of May 19, 2015, the date SSA, assisted by police officers, took the children into protective custody. Petition allegation b-11 alleged that on May 19, law enforcement gained entry by use of force

10

after making multiple announcements. Allegation b-12 alleged that on May 19 the home was severely cluttered with trash, clothes, and other items, the home was dark inside and the windows covered with cloth, and the children had been sleeping on a single small child's bed in the living room.

As recounted above, SSA's reports, admitted into evidence at the jurisdictional hearing, contained information the officers forcibly entered on May 19 after no one responded to 30 minutes of knocking and verbal warnings. They found mother hiding in a closet with a wooden bat, and the children, crying and frightened, hiding in a closet in a different room. One of the girls pointed scissors at the officers. M.F. later said she was holding a pair of scissors to "'chop off the heads of the police'" because "'that's what [her] momma said to do.'" Mother told them the police were going to take them away. The reports also noted the maternal grandmother obtained a three-year protective and move-out order against mother based on elder abuse in October 2011.

After the parties rested, SSA argued the court should assert jurisdiction over the children based on mother's neglect of the children's medical, dental, and educational needs, likely resulting from mother's untreated mental health issues. Counsel cited the children's deficient academic skills, behavioral problems, and lack of social skills. Counsel also expressed concern over the events of May 19, including mother directing the children to hide from police officers and giving one of her children scissors.

The court noted mother was suffering a "delusion [on May 19] that the authorities" were not authentic, and she and the children "took up . . . arms," in what was a "pretty dangerous situation . . . ." The court noted "lots of examples of people being seriously injured as a result of exactly that kind of thing."

The court ultimately allowed county counsel to amend the petition to conform to proof and to add language to b-11 that "[M.F.] was found in a closet holding a pair of scissors and stated she was holding the scissors because that's what my momma said to do. [S.F.] was found in a closet holding a bat. Mother was holding a bat in a

11

different closet." The court also allowed SSA to add allegation b-13, which provided, "The children were subjected to numerous incidents of violence in the home and mother failed to protect the children from said violence."

Mother objected the amendments were untimely and violated her due process rights. The court denied mother's request to re-open the case for additional cross-examination of the social worker, to allow mother to testify, or for additional argument. Mother's counsel did not articulate what new or additional evidence he would elicit. The court explained mother received adequate notice because the information supporting the amendments was contained in the reports.

The juvenile court may allow amendments to a dependency petition to conform to proof. (See § 332, subd. (f) [dependency petition must contain a "concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted"]; § 348 [Code of Civil Procedure section 469 et seq., relating to variance and amendment of civil pleadings applies to dependency petitions]; Code Civ. Proc., § 469 [no variance between a pleading allegation and the proof deemed material unless it has prejudicially misled the adverse party].) Where the nature of the allegation in a dependency petition and the proof are "quite similar," the juvenile court abuses its discretion by not allowing an amendment according to proof. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.)

"The primary function of a pleading is to give the other party notice so that it may prepare its case [citation], and a defect in a pleading that otherwise properly notifies a party cannot be said to affect substantial rights." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240.) Here, mother did not object to the admission of any evidence, including evidence contained in SSA's reports, on the grounds the evidence varied from the original pleading. The original petition alleged generally and specifically the children were at risk of serious harm or illness because of mother's unresolved mental

12

illness (allegation b-6). The petition alleged mother had failed to appear for the detention hearing and was advised a warrant might issue (allegation b-10). In the original petition, SSA alleged the children were at risk when mother refused to admit law enforcement, requiring officers to make a forceful entry (allegation b-11). The amendment of allegation b-11 to reflect M.F. held scissors and that mother told her to do so was an elucidation that did not substantially vary the pleading. The variance between count b-11 as originally pled and as amended was not substantial.

New allegation b-13 alleged the children were subjected to numerous incidents of violence in the home and mother failed to protect them. Mother asserts these incidents included the May 19 incident, Erika's behavior, and whatever led to the maternal grandmother's restraining order against mother. She contends this, along with allegation b-11, constituted a "radical change in the bases proffered for dependency jurisdiction" and cannot be reconciled "with mother's fundamental right to notice and a fair opportunity to respond to the actual grounds upon which the petition was sustained."

We disagree. Existing allegation b-9 asserted mother failed to protect the children from Erika's violence. According to this allegation, mother stated Erika had cut a hole in a gas line causing the family to become ill, and she feared for her and the children's life and safety when Erika came to the home. The court sustained "the petition," including b-9. Mother was adequately apprised of the allegations that might deprive her of custody. (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 751; *In re Justice P.* (2004) 123 Cal.App.4th 181, 188.) But assuming mother was denied notice concerning other aspects of allegation b-13, allegation b-11 was sufficient to sustain jurisdiction and any error concerning other bases of jurisdiction is harmless. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 [if a single jurisdictional finding is supported by substantial evidence appellate court may decline to address additional jurisdictional allegations].)

13

The court also did not abuse its discretion or violate mother's due process rights by denying mother's request to re-open the trial after the amendments to allow additional cross-examination of the social worker or to allow mother to testify. As noted, mother had notice of the information underlying the amended and additional allegations from SSA's reports. She did not object to admission of any evidence contained in the reports as varying from the allegations of the original petition. She could have cross-examined the social worker or presented other evidence to counter information in the reports, given the original petition relied on the May 19 incident to establish jurisdiction. Finally, mother did not advise the court what she hoped to establish with additional cross-examination or testimony. She did not suggest calling the children as witnesses. It is not reasonably probable, given the record before us, that additional cross-examination or testimony would have affected the result in this case.

B.   *Substantial Evidence Exists to Affirm the Juvenile Court's Jurisdictional Findings*

Mother also contends there is insufficient evidence to support the juvenile court's findings the children were at substantial risk of suffering serious physical harm or illness as a result of mother's failure or inability to adequately supervise or protect them. (§ 300, subd. (b); *In re James R.* (2009) 176 Cal.App.4th 129, 135-136 [jurisdictional finding under section 300, subdivision (b), requires neglectful conduct by the parent, causation, and a substantial risk of serious harm or illness at the time of the jurisdictional hearing].) We review the issue for substantial evidence. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 [reviewing court determines if there is evidence that is reasonable, credible, and of solid value to support the juvenile court's findings, all conflicts in the evidence are resolved in favor of the prevailing party, and juvenile court's determination is not disturbed unless it exceeds the bounds of reason].)

As recounted in detail above, the events of May 19, 2015, capped a series of incidents demonstrating mother suffered from mental illness that isolated her daughters and put them at grave risk of serious physical harm and illness. The record

14

reflects mother had a history of neglecting the children and their half siblings. In the current case, mother declined to accept voluntary services and refused to follow through on an agreed-upon safety plan. She refused to participate in drug testing to establish whether she might have an underlying substance abuse problem. Her ostensible action to protect the children from threats posed by older daughter Erika (assuming the threat was not itself imagined) by keeping them out of school and in virtual seclusion was itself devastatingly harmful, unlawfully denying the girls an education. She neglected to take appropriate action to protect the girls from Erika, such as obtaining a restraining order. Most significantly, although she was warned warrants would issue, mother failed to appear with the children in court in March 2015, and then refused to comply with the service of the warrants in May 2015, necessitating law enforcement's forcible entry into the home. As the juvenile court noted, this action was "incredibly dangerous" and "could have resulted in the serious injury or even death of these children."

Finally, mother had not taken the children to the doctor or dentist in at least two years. The juvenile court's conclusions notwithstanding, mother's failure to ensure regular medical and dental care also posed a risk of serious harm. Mother's failure to immunize her children placed them at risk of developing serious, but preventable illness. Mother's neglect of their dental health necessitated extensive dental work. Anesthesia associated with dental treatment also posed a risk of serious harm. Overwhelming evidence supports the jurisdictional findings.

C. *SSA Failed to Comply with ICWA Requirements*

According to the detention report, mother denied Indian heritage and stated father Louis F. was deceased. The social worker remarked the Indian Child Welfare Act did not apply. Mother later advised SSA's ICWA social worker she did not have Indian heritage, but father did. She could not provide further information about father or his family. Mother completed a Parental Notification of Indian Status (ICWA-020) form claiming she may have Indian heritage. The ICWA social worker documented the

15

information she had obtained on a form (ICWA-30) and notified the Bureau of Indian Affairs.

At the detention hearing, the court asked mother if she had American Indian heritage. Mother stated she knew the children "have [it] in their blood" and she had "some too," although she was adopted and did not have a birth certificate anymore. She could not provide a tribal name. Mother also stated the children's deceased father had American Indian heritage in his family, but she could not name a tribe. She did not know of a family member for her or father who was an enrolled member of a tribe. The children were not enrolled members of any tribe. The court ordered SSA to continue the inquiry to determine whether there was Indian heritage.

A paternal aunt, Monica P., informed the social worker in June 2015 she lived with the paternal grandmother, Freda. Nothing in the record reflects the social worker inquired of the paternal relatives whether father had Indian heritage. Before the jurisdictional hearing, the court filed receipts reflecting the ICWA-030 form had been served on the Bureau of Indian Affairs and mother. The ICWA-030 form lists the father's name and possible date of birth, but no other information for him or his relatives. At the dispositional hearing in September 2015, the juvenile court found ICWA did not apply.

State and federal law require the court and SSA to investigate whether a dependent child might be an Indian child, and to notify potential tribes so they can determine whether a child is eligible for membership and whether intervention in the dependency proceeding is warranted. (25 U.S.C. § 1901 et seq.; 25 U.S.C. § 1903 ["Indian child" means any unmarried person who is under age eighteen and is either a member of an Indian tribe or eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe]; § 224.1, subd. (a).) There is a affirmative and continuing duty to inquire whether a child is or may be an Indian child in all dependency proceedings where the child is at risk of entering or in foster care.

16

(§ 224.3, subd. (a); 25 U.S.C. § 1912, subd. (a) [where court knows or has reason to know an Indian child is involved, Indian child's tribe must be notified by registered mail with return receipt requested].)

SSA concedes its ICWA notices preceded the contacts with Louis's relatives, and it made no further inquiries after receiving the information. But the agency argues Louis F. was not established as the children's biological father, so there was no error in failing to inquire of alleged paternal relatives. We disagree. Mother stated he was the girls' biological father, and SSA proceeded in this case as if he was the biological father. No other biological father was identified. Louis' sister and mother believed Louis was the father, and they had visited the girls. The girls also carried Louis's last name.

Because there was substantial evidence Louis was the girls' biological father, the court erred in finding ICWA did not apply without inquiring of paternal relatives concerning Indian heritage. This does not require reversal of the jurisdictional or dispositional orders and findings, other than the finding ICWA does not apply. (See *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 260 [violation of ICWA's notice provisions renders voidable actions taken without the requisite notice].) We direct the trial court to order SSA, if it has not done so already, to ask paternal relatives whether Louis had Indian heritage and to notify any tribes and BIA as necessary.

17

## III

### DISPOSITION

The juvenile court's September 22, 2015, finding ICWA does not apply is reversed and the trial court is directed to proceed in a manner consistent with this opinion.  In all other respects, the judgment is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.


18